United States District Court
Southern District of Illinois

ERIC D. WELCH )
    Petitioner, )
     )
vs. ) Case No. _____
     )
D. SPROUL (WARDEN), )
    Respondent. )

## GROUND AND MEMORANDUM
## IN SUPPORT OF PETITION UNDER 28 U.S.C. § 2241

Eric D. Welch appears *pro se* and petitions the Court under Title 28 of the

United States Code, Section 2241, on the Ground below, pursuant to the United

States Constitution, Amendment I (Free Speech), Amendment V (Due Process),

or Both, affecting how his sentence is being carried out.

Classification decisions prompted by disciplinary proceedings are

unconstitutional if they are done for unconstitutional reasons, such as retaliation

for exercise of First Amendment rights.  The effect of retaliatory disciplinary

proceedings for exercising protected rights impelled the Administrative remedy

process   set forth below.  This was complete in this case on November 14, 2019.

The issue is ripe for review.

<u>Ground for Relief</u>

Respondent's Agents (BOP Employees) Engaged in Retaliation Which Artificially *Inflated Petitioner's Custody/Classification Level* (classification change for unconstitutional reasons), Where Agent Demonstrated an *Improper Motivation* (the agent was a defendant in a lawsuit), Which Played a *Substantial Part* in the Agent Giving Petitioner an Incident Report ("Shot") for *Trying to Pay a Court Fee* Through a Third-Party Citizen (petitioner was a witness and potential class member against agent)

<u>Facts</u>

1. In December 2018, the First-Step Act was signed into law and promoted empirically driven, evidence-based re-entry programs for federal inmates. [FSA 2018].

2. Just prior to passage of FSA 2018, Petitioner Welch's former case manager, Aaron Deaton, had indicated to Welch that "you should start thinking about what low-security prison you want to go, because your points will go low in February."

3. After Petitioner's case manager changed (from Aaron Deaton, to Heath Clark), Welch again verified that this was the situation, and was told by Clark that his points "are at a spot where you should think about where you want to go, but I'm not going to surprise you or anything.  You have the right to pick a spot that has a program you feel is something you could benefit from."

4. In the winter of 2019, Petitioner Welch requested participation and
   enrollment information from the Religious Services Department at U.S.P. for
   admission in the *Life Connections Program*. This is a faith-based, First-Step Act
   approved re-entry course that is 18-months long and is empirically
   established as successful in curbing recidivism. The low-security version is
   available at the BOP prison in Milan, Michigan (the same state as Petitioner's
   release address, where his parents are located in Clifford, Michigan).

5. In November of 2019, both Case Manager Heath Clark, and Religious Services
   Chaplain Steve Holem, told Petitioner that he was "all good to go on our end
   for a transfer to *Life Connections*, but the shot you got in June of 2019 [the only
   disciplinary report Welch ever received since beginning his sentence in 2010],
   is stopping us from submitting your paperwork. The *Life Connections Program*
   requires that you are 'shot-free' for 12 months prior to acceptance into the
   program."

6. The gist of the instant Petition is retaliation for involvement in a lawsuit
   against the staff member who wrote or otherwise was involved in writing the
   shot: Respondent's agents (BOP employees uninvolved with inmate care)
   issued Petitioner a "shot" (engaged in retaliation) for obscured reasons,
   which artificially inflated his custody/classification level, demonstrating an
   improper motivation (the agent was a defendant in a lawsuit), which played a

3

substantial part in the agent giving petitioner an incident report for petitioner

trying to pay a court fee to the S.D. of Illinois.

7. For context, this Petition relies in part on the Facts section of a Complaint for

Damages filed in this Court:

   a. *James R. Kammeyer, Jr., Phillip Carrier, and All Inmates Housed at U.S.P. Marion vs. William True (Warden), D. Stickles (Captain), Daniel Huggins (S.I.S.), and the United States of America,* S.D. Ill., **Case No. 3:19-cv-454**.

   b. That lawsuit was filed under Prison Mailbox Rule on April 25, 2019. (Providentially the same day as the Catholic feast of *St. Mark the Evangelist,* the patron saint of notaries and sworn signatures.)

   c. That Complaint is fully adopted into this Petition as if set forth here, including its attachments, and is referred to by this Petition in the same manner as an exhibit citation, but by referencing the case number.

   d. Courts may take "judicial notice" of facts which are "not subject to reasonable dispute" because they are either "**(1)** generally known within the territorial jurisdiction of the trial court or **(2)** capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Rule 201(b), Federal Rules of Evidence.

8. In brief, during the last few days of March 2019, Respondent and

Respondent's agents (each acting in both official and individual capacities)

locked down U.S.P. Marion because staff had systemically failed to follow

BOP policy in administering (motor-skills assessment or other) field-sobriety

checks of inmates suspected of getting high (ingesting/smoking "K2",

"Spice", or industrial chemicals). Respondents permitted and even promoted

individual inmates to be free from responsibility for their own behavior via

4

unwillingness or inability to have custody staff and medical staff work together on these infractions.

9. The number of "high" inmates-per-day was estimated by staff and prisoner-litigants to be approximately eight, every two to three days. [3:19-cv-454, *passim*]. U.S.P. Marion houses approximately 1,120 inmates. [www.bop.gov]. Many of these intoxications were incidents repeated by the same individuals, thus the actual number of those involved was a small fraction compared to the overall inmate population.

10. U.S.P. Marion is a programming yard. It is listed or administered as both a sex offender yard, as well as a gang "drop-out" yard, where inmates with these types of former history may improve themselves in a less-political (i.e. "safe") environment. [*See, "Allen Ellis Guide to Federal Prisons: 2018"*; see also, www.bop.gov].

11. During the lock-down, Respondent/Respondent Daniel Huggins assembled several inmate leaders ("shot-callers") and ordered the inmates to punish other inmates suspected of being intoxicated. Subsequently, inmate Carrier lost the use of his eye in a vendetta attack that occurred under the *pretext* of drugs, where no drugs were involved. [3:19-cv-454, *passim*].

12. It is uncontested that numerous individuals were viciously assaulted (or assaulted others themselves) in a free-for-all coordinated by the Respondents. [*Id.*]

13. Fifteen or more witnesses reported mass punishment of all inmates by Respondent and Respondent's agents. Inmate property was forcibly discarded without regard to involvement in drugs or any other disciplinary proceeding. Several hundred thousand dollars of government and inmate property (e.g. microwaves and textbooks) were destroyed in this manner during the April 2019 lockdown. [*Id.*]

14. During this time and immediately after lockdown (mid-April), sworn affidavits attest to the fact that Respondent's agents said in order for mass punishment to be lifted, inmates were to take matters into their own hands and assault one another with impunity if intoxicants were suspected. These directions were always verbal with witnessing inmates later writing affidavits. Other than the surreptitious conversations immortalized in the affidavits, no further training was given to inmates in how to identify those needing "punishment". [*Id.*]

15. Petitioner Eric Welch (and inmate James Kammeyer), in conversation with inmates Thomas Attebury and Carlton Miller agreed that in order to make payment to the court in a lawsuit most effective, any inmate (who had the

means) would send a portion of the court's filing fee to a Jeannie Kranendonk (inmate Kammeyer's sister), who would then pay the court directly and completely.  [Exhibits G, H, I, J].

16. On Sunday, April 28, 2019 Petitioner Welch requested that the BOP release $110 to Jeannie Kranendonk.  That request was processed by the prison on May 2, 2019.  [Exhibit G].

17. Shortly afterward (within a day), inmate Kammeyer became very sick with a combination of the flu and his recurring *Chrohn's Disease*, exacerbated by panic attacks caused by the recent inmate-inmate violence promoted by staff. [Exhibits G, H, I].

18. On or about April 29, 2019, unbeknownst to Petitioner Welch, inmate Kammeyer (in this delirious state), paid both the entire fee to the court <u>and</u> sent a confusing email to Ms. Kranendonk, indicating *"My friends name is Eric. I'm not sure how much he is going to send, but said he will send it out soon, now that he has your address."* [Exhibit F].

19. On May 9, 2019, Kammeyer's confusing (*"I'm not sure"*) communication with Ms. Kranendonk prompted her reply to Kammeyer: *"I got a check from Eric today in the mail.  It says at the bottom, 'Happy St. Mark's day, Jimmy Jr...' not sure what that means, really."*

    a. In context, St. Mark's day is April 25, the day the lawsuit was filed in the S.D. of Illinois (Prison Mailbox Rule) and was a poetic reference

shared amongst those at U.S.P. Marion for the grave offenses against human dignity manifested by Respondent's agent Huggins and others, filed on the same day as the patron saint of Notaries and Sworn Signatures.

b. "*Jimmy Jr.*" refers to the lead petitioner in the caption of the class action law suit [3:19-cv-454], because Welch at the time did not have the case number (but did have the parties names) to put in the memo field of his check to Ms. Kranendonk.

c. Mr. Welch believed she already knew to send the money to the court, and had no idea she was confused about sending money anywhere else. [Exhibits G, H, I, J].

d. She went on to say "*I will have to go online and send the money to you tonight or if I can't get to it, I will do it when I get home on Sunday night.*" [Exhibit F].

20. The emails between Kammeyer and Kranendonk did not include Welch, and did not indicate the same understanding shared by Welch, as verified by several direct eye-witnesses to the surrounding conversations.  Later, Kammeyer took full responsibility for his state of mind and the misdirection it caused in the Joint Verified Statement.  [Exhibit G].

21. There were no hard feelings amongst the inmates (Welch, Kammeyer, Attebury, Miller), because of the importance of seeing the lawsuit take off.

22. Two and a half weeks after the lawsuit was filed, on Sunday, May 12, 2019, Respondent's agent Huggins commanded Welch present himself to the Lieutenant's office.  Events are described in the attached "Joint Verified Statement of James Kammeyer and Eric Welch."

8

23. In that meeting, Huggins (the Respondent's agent at bar and a named defendant on the law suit) interviewed Welch, threatening him with two shots, and kept bringing up the "lawsuit" but Welch did not answer, considering Witness Tampering an illegal act. [Exhibit G].

24. One day later, on May 13, 2019, Respondent's agent Huggins presented Welch with an incident report. That incident report charged Welch with prohibited conduct code 217A: "Giving money to, or receiving money from, any person for the purpose of any other prohibited purpose." [Exhibit F].

25. On May 14, 2019, Thomas Attebury, a witness to the conversations contemporaneous to the events, signed a sworn affidavit chronicling the manner in which payments were to be sent to the S.D. of Illinois (i.e. through Ms. Kranendonk and that is in fact what Welch believed when he sent her the funds. [Exhibit H].

26. On May 15, 2019, Welch and Kammeyer authored a "Joint Verified Statement" chronicling the actual facts they mutually understood to be true, in that Welch believed Mr. Kranendonk would send the money to the court. Petitioner was unaware of statements Kammeyer made to Kranendonk about sending money elsewhere, but only knew it to go to the court. [Exhibit G].

27. On May 15, 2019, Carlton Miller, another witness to the conversations contemporaneous to the events, signed a sworn affidavit chronicling the

manner in which payments were to be sent to the S.D. of Illinois for the

lawsuit through Ms. Kranendonk and that is in fact what Welch believed

when he sent her the funds. [Exhibit I] . Ultimately, it was revealed that

Kammeyer had paid the court fee himself while in his reduced state of health

and Petitioner did not know this at the time of his disbursement.

28. On May 19, 2019, Welch sent an email to Mr. Shannon Wallace, the

Disciplinary Hearing Officer ("DHO"). [Exhibit J] . In that email, Welch

repeated the "Joint Verified Statement," and also shared that he had tried to

submit his statement to the Unit Disciplinary Committee ("UDC") but they

refused to accept it.

29. Welch's email highlighted the following:

   a. That there were no facts from Welch (email, phone call, or other
      document) about asking Kranendonk to send money to inmate
      Kammeyer, but rather symbolically referenced the filing date of the
      case (St. Mark's Day) and the lead plaintiff's name (Jimmy Jr.)

   b. That Respondent's agent's inference about Welch's knowing
      transference of money to Kranendonk, would require more than
      Kammeyer's own admittedly misdirected email.

   c. That poor communication on another person's part does not create a
      money-laundering conspiracy.

30. On June 21, 2019, DHO reduced the "shot" from a 217A, to a 328A:

Attempted giving money or anything of value to, or accepting money or

anything of value from, another inmate or any other person without staff

10

authorization.  In short, the BOP's position on the issue had changed.

[Exhibit E].

31. At that June 21, 2019 DHO hearing, staff representative Mr. Kalen Miles

spoke on behalf of Petitioner Welch, saying "working with Welch, he is very

legal savvy and I don't see him intentionally doing something like this.  I

don't see him intentionally transferring money in a traceable manner. He's

been in UNICOR for 8 years."  [Exhibit E at ¶II(C)].

32. Petitioner appealed the incident report to BOP's North Central Regional

Office, because of its retaliatory nature affecting his custody/classification

level and ultimate approval time for participation in the *Life Connections*

*Program*.  [Exhibit B, D].

33. North Central Regional Office ("NCRO") denied the appeal because they

thought Petitioner Welch was "*now* claiming the money was for filing fees for

a joint lawsuit against the institution[.]" (Emphasis added).  The mistaken

insinuation by NCRO was that the legal filing fee was a later addition.

   a. NCRO apparently assumed that the lawsuit fee was an afterthought,
      even though testimony *prior* to the D.H.O. hearing (and contained *in
      the April 25 lawsuit itself* with Welch's affidavit) demonstrated
      otherwise; and

   b. NCRO misstated the facts:  Welch had *always* stated the money was for
      a lawsuit (although not a "joint" lawsuit, but rather a potential "class
      action").  [Exhibit G, H, I, J].

34. Petitioner appealed the Regional denial to the BOP's Central Office "National Inmate Appeals" because the BOP's position had changed and because the punishment was improperly motivated (mentioning the lawsuit against the person(s) who wrote the shot). [Exhibit B].

35. On November 14, 2019, the BOP's position changed again to a nonspecific, bland conclusion by Central Office: "[due to] the evidence detailed in Section V of the DHO report," the appeal was denied. [Exhibit A].

    a. The appeal response did not address that punishment for paying a portion of a lawsuit to the court "blocking my *Life Connections Program* Transfer". [*Compare* Exhibit A, *with* Exhibit B];

    b. The appeal response did not address the time sequence of events that Region got backward. Did not address the improper inference of finding Welch guilty of sending money where the eye-witnesses testified it was "for the court" and the shot was written by a defendant on that lawsuit. [*Compare* Exhibit A, *with* Exhibit B];

    c. The appeal response did not address that another staff member familiar with Petitioner testified that Welch was legal savvy and would not have intentionally sent money to Kammeyer through Kranendonk, harmonizing with the inmate affidavits; and

    d. The appeal response did not address that the misdirected funds were stopped by Ms. Kranendonk (and never sent to Kammeyer) due to the mistake of communication which Kammeyer admitted under oath.

Discussion of Law and Standards

The right of access to courts is a very important right, since it theoretically
protects all of an inmate's rights. *McCarthy v. Madigan*, 503 U.S. 140, 153 (1992)
(Because a prisoner is ordinarily divested of the privilege to vote, the right to file
a court action might be said to be his remaining most fundamental political right,
because it is preservative of all rights.) This right extends to all categories of
prisoners and it is supposed to be "adequate, effective, and meaningful." *Bounds
v. Smith*, 430 U.S. 817, 822 (1977). Prison officials are prohibited from retaliating
against inmates who access the courts.

Retaliation claims are brought when prison officials retaliate against prisoners
who brought (or tried to bring) legal actions. To state a retaliation claim
Petitioner must allege (**1**) that the speech or conduct at issue was protected, (**2**)
that the respondent took adverse action against the petitioner, and (**3**) that there
was a causal connection between the protected speech and the adverse action.
*Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009); *accord, Thaddeus-X v. Blatter*, 175
F.3d 378, 394 (6th Cir. 1999) (en banc).

Classification decisions are unconstitutional if they are done for
unconstitutional reasons, such as retaliation for exercise of First Amendment
rights, or racial, religious, or political discrimination. *Lucien v. DeTella*, 141 F.3d
773, 774 (7th Cir. 1998); *Koch v. Lewis*, 399 F.3d 1099 (9th Cir. 2005) (classification as

a gang member based on flimsy and outdated evidence after petitioner won lawsuits against prison officials established a *prima facia* case of retaliation).

Claims that prisoners have been disciplined or transferred in retaliation for lawsuits or other constitutionally protected conduct must often be proven by **inferences from the time sequence of the prisoner's and the prison officials' actions**. At minimum, Petitioner should allege "a chronology of events from which retaliation may plausibly be inferred." *Cain v. Lane*, 857 F.2d 1139, 1143 n.6 (7th Cir. 1988). This is likely governed by the "reasonable relationship" standard, which lets officials discipline inmates as long as they are reasonably related to legitimate penological interests. *Lewis v. Casey*, 518 U.S. 343, 361-362 (1996) (citing *Turner v. Safley*, 482 U.S. 78 (1987).) That means that even if an official's actions harm the prisoner, they do not violate the right of court access if they are reasonably related to legitimate ends. *Id.* The time sequence of Welch's protected activity and the adverse action by those on the business end of a lawsuit is one possible factual scenario for believing that the adverse action taken was done for retaliatory reasons and not for a legitimate correctional purpose.

Prison officials may not retaliate against prisoners for using the courts or trying to do so, whatever the form of the retaliation. *DeTomaso v. McGinnis*, 970 F.2d 211, 214 (7th Cir. 1992) ("whether the retaliation takes the form of property or privileges does not matter") (dictum). Respondent covertly retaliated against

Petitioner with false disciplinary charges.  The major factual issue is what the real reasons for those actions were.

Unconstitutional retaliation may be remedied by an injunction, even if the retaliation was not formally part of official policy.  *Gomez v. Vernon*, 255 F.2d 1118, 1127, 1129-30 (9th Cir. 2001); *Ruiz v. Estelle*, 679 F.2d 1115, 1154 (5th Cir. 1982).

To support a retaliation claim, adverse action must be sufficient to deter or "chill" a person of "ordinary firmness" In the exercise of constitutional rights. *Morris v. Powell*, 449 F.3d 682, 685-86 (5th Cir. 2006) (describing "ordinary firmness" rule as a "*de minimis* standard").

Prisoners do not have to show that they were actually deterred from exercising their rights; if that were the law, the fact that a prisoner kept complaining or filed suit about the retaliation would defeat the claim.  *Espinal v. Goord*, 558 F.3d 119, 128 n.7 (2nd Cir. 2009).

The question whether a particular action would deter a person of ordinary firmness is an objective one and does not depend on how a particular petitioner reacts; the question is whether the respondent's actions are capable of deterring a person of ordinary firmness.  *Bell v. Johnson*, 308 F.3d 594, 605-06 (6th Cir. 2002). Adverse action(s) need not independently violate the Constitution to support a retaliation claim.  *Hoskins v. Kenear*, 395 F.3d 372, 375 (7th Cir. 2005); *DeWalt v.*

15

*Carter,* 224 f.3d 607, 618 (7th Cir. 2000) (citing *Babcock v. White,* 102 F.3d 267, 275

(7th Cir. 1996)); *Zimmerman v. Tribble,* 226 F.3d 568, 573 (7th Cir. 2000)  (allegation

that petitioner was excluded from the law library in retaliation for his complaints

did not state a claim of denial of access to courts, **but did state a retaliation**

**claim**).  Nor need the retaliation impose "atypical and significant hardship on the

inmate in relation to the ordinary incidents of prison life" as is required to

support a claim of deprivation of liberty denying due process.  *Sandin v. Conner,*

515 US. 472, 484 (1995); *Scott v. Churchill,* 377 F.3d 565, 567, 569 (6th Cir. 2004)

(holding retaliation claim could go forward based on disciplinary charges, even

those that were dismissed.  At bar, this implies an even lower burden than

Petitioner Welch has to prove since his disciplinary charges remaining are one

basis for this petition.)

Among the actions that courts have found sufficiently adverse to support a

retaliation claim are the filing of false disciplinary charges [*Austin v. Terhune,* 367

F.3d 1167, 1170-71 (9th Cir. 2004); *Milhouse v. Carlson,* 652 F.2d 371, 373 (3rd Cir.

1981)]; unfavorable classification [*Madewell v. Roberts,* 909 F.2d 1203, 1206 (8th Cir.

1990) (blocking reclassification opportunities); *Purcell v. Coughlin,* 790 F.2d 263,

265 (2nd Cir. 1986) (classification)].

Some courts have held that a retaliation Petitioner must prove that "but for"

the retaliation, the adverse action would not have occurred, but that is not the

16

case in our circuit. Like the Seventh Circuit, most courts have held that the petitioner need only show that protected speech was a "motivating factor" for retaliation, at which point the burden of proof shifts and the Respondent, who must show that the adverse action would have been taken anyway. *Hasan v. U.S. Dep't of Labor*, 400 F.3d 1001, 1006 (7th Cir. 2005); *accord, Scott v. Coughlin*, 344 F.3d 282, 287-88 (2nd Cir. 2003 ) (petitioner must show "improper motivation" played a "substantial part" in respondent's decision).

This "burden-shifting" rule is the rule in retaliation cases involving employment. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977).  The Seventh Circuit in *Hasan*, above, said:  "We cannot think of a reason why a stricter standard for proof of causation should apply when the petitioner is a prisoner rather than an employee.  A prisoner has less freedom of speech than a free person, but less is not zero, and if he is a victim of retaliation for the exercise of what free speech he does have, he should have the same right to a remedy as his free counterpart." *Hasan*, 400 F.3d at 1006.

Petitioner must produce evidence that the adverse action was in fact done for retaliatory reasons.  *Richardson v. McDonnell*, 841 F.2d 120, 122-23 (5th Cir. 1988).  Such evidence may be direct, such as statements by prison officials or staff indicating their motive for taking the adverse action, or Petitioner's own sworn statements based on personal knowledge, or those of other prisoners, recounting

facts (not suspicions or guesses) that support the claim of retaliatory motive.
*Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir. 2009).

Often there is no direct evidence, so prisoners must rely on circumstantial evidence. *Bennett v. Goord*, 343 F.3d 133, 138-39 (2nd Cir. 2003) (direct evidence of retaliatory motive is not required where circumstantial evidence is sufficiently compelling). Types of evidence that have been found to support retaliation claims include the suspicious timing of adverse action shortly after the prisoner has made complaints or filed grievances. *Mays v. Springborn*, 575 F.3d at 650 (commencement of more onerous searches immediately after petitioner complained of searches);  *Espinal v. Goord*, 558 F.3d 119, 129 (2nd Cir. 2009) (passage of six months between lawsuit and beating by officers including one of the respondents supported an inference of causation); *see* also, *Harris v. Fleming*, 839 F.2d 1232, 1236-38 (7th Cir. 1988). Other types of evidence that have been found to support retaliation claims include the adverse action that is based on flimsy or suspect evidence. *Bruce v. Ylst*, 351 F.3d 1283, 1288 9th (Cir. 2003).

The fact that there is "some evidence" to support adverse action does not automatically mean it was not retaliatory. (The adverse action at bar was writing Petitioner a shot which inflated his custody/classification and excluded him from programming, for his paying a court fee to a third party without staff assistance). *See, Bruce,* above; *Hines v. Gomez*, 108 F.3d 265, 268-69 (9th Cir. 1997).

Only one federal circuit has taken the opposite position. *See, Moots v. Lombardi*, 453 F.3d 1020, 1023 (8th Cir. 2006) ("conduct violations cannot be deemed retaliatory when they were issued for actual violations of prison rules"; if a respondent shows there was *some evidence* of the infraction, claim of retaliation is barred. The mere fact that officials show Petitioner committed an offense for which he was disciplined will generally meet Respondent's burden of proof to show that their actions were not retaliatory. *Gayle v. Gonyea*, 313 F.3d 677, 682 (2nd Cir. 2002) (holding that officials can defeat a retaliation claim by showing it is undisputed that the petitioner "committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report").

But by contrast here, the Respondent will still need to overcome the time sequence of events and eyewitness testimony of four sworn witnesses contradicting the perfunctory denial of expungement of the "shot." See the Seventh Circuit decisions of *Hoskins, DeWalt, Babcock*, above. They also face explaining away the deeply personal involvement of a defendant on the lawsuit involved in writing the shot to begin with.

Argument

Petitioner engaged in constitutionally protected conduct when he filed

support in a lawsuit (an affidavit of factual observations, as a potential class

member, and assisted with the filing fee as a potential class member).  The

lawsuit was against, among others, the Respondent's agent(s) who wrote a

disciplinary incident report against Petitioner.

Respondent's shot directed at Petitioner had improper motivation which

played a substantial part in inflating Petitioner's custody/classification level and

outweighs any legitimate penological interest.  "Getting back" at inmates

accessing the court (i.e. paying a joint filing fee) is a constitutional concern.

The findings of DHO and subsequent appeal answers by the BOP

administrative staff shifted positions over time, and failed to address the greater

weight of the evidence proving Welch had no idea that sending money to the

court through one individual, would be thwarted by a poor communication

between two other people with whom Petitioner was not privy to their private

talks.

As such, Respondent's Agents (BOP Employees) Engaged in Retaliation

Which Artificially *Inflated Petitioner's Custody/Classification Level* (classification

change for unconstitutional reasons), Where Agent Demonstrated an *Improper*

*Motivation* (the Agent was a Defendant in a Lawsuit), Which Played a *Substantial*

*Part* in the Agent Giving Petitioner an Incident Report ("Shot") for *Petitioner*

*Trying to Pay a Court Fee* (in which petitioner was a witness and potential class

member against agent).


Conclusion and Relief Requested

1.  Petitioner prays that the court vacate the Incident Report(s) of any
    Prohibited Act Code(s) mentioned or implied above as retaliatory action
    by prison officials (who were either named defendants in a lawsuit prior
    to the incident report being written, or whose involvement as moral
    agents were immortalized in the inmate witness affidavits);

2.  Declare that artificially inflating Petitioner's custody/classification level
    (and subsequent delay or disqualification from the *Life Connections
    Program*, any other programming, treatment, and supervised release
    considerations), violates the First Amendment, the Fifth Amendment, or
    Both.

December 6, 2019 ____ /s/ _____Eric Welch_____

Date Executed                                                    Eric D. Welch, *pro se*
Under penalty of perjury pursuant to                                        Paralegal
28 U.S.C. § 1746, I hereby swear and verify                                 10444-089
that the foregoing is true and correct as an affidavit                    P.O. Box 1000
in the Facts set forth;  Further, that it has been deposited          Marion, IL  62959
this day via Prison Mailbox Rule in the institution's
internal mail systems designed for legal mail, United
States Postal Service, first-class postage prepaid.

# Table of Exhibits

Exhibit A:   BP-11 Denial

Exhibit B:   BP-11 APPEAL

Exhibit C:   BP-10 DENIAL

Exhibit D:   BP-10

Exhibit E:   DHO REPORT

Exhibit F:   INCIDENT REPORT

Exhibit G:   MAY 15, JOINT VERIFIED STATEMENT OF INMATES KAMMEYER AND WELCH

Exhibit H:   MAY 14, VERIFIED STATEMENT OF INMATE THOMAS ATTEBURY

Exhibit I:   MAY 15, VERIFIED STATEMENT OF INMATE CARLTON MILLER

Exhibit J:   MAY 19, EMAIL FROM WELCH TO DHO OFFICER WALLACE

ERIC DEXTER WELCH, 10444-089
MARION USP     UNT: UM EAST     QTR: B03-015L
P.O. BOX 2000
MARION,  IL 62959



**Administrative Remedy No. 984472-A1**
**Part B - Response**

You appeal the June 21, 2019, decision of the Discipline Hearing
Officer (DHO) regarding incident report #3255949 in which you were
found to have committed the prohibited act of Giving Money or Anything
of Value to, or Accepting Money or Anything of Value from, Another
Inmate or Any Other Person without Staff Authorization - Attempted
(Code 328A).  For relief, you request the incident report be
expunged.

Our review of your disciplinary proceedings indicates compliance
with Program Statement 5270.09, Inmate Discipline Program.  The
DHO's decision was based upon the evidence detailed in Section V of
the DHO report.  We find the determination of the DHO is reasonable
and supported by the evidence.  Your Due Process rights were upheld
during the discipline process.  The sanctions imposed were
commensurate to the severity level of the offense committed and in
compliance with policy.

Accordingly, your appeal is denied.


_____                    _____
Date                                         Ian Connors, Administrator
                                             National Inmate Appeals


**Exhibit A: BP-11 Denial**

U.S. Department of Justice

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Accepted as timely filed, prison mailbox rule, by BoP Agents of Central office of UsP Marion by deposit this

day in the legal mailroom re-filed receipt # 7017 1450 0000 6834 3243

---

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: WELCH, ERIC, D.                   10444-089           B            USP Marion
LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT           INSTITUTION

**Part A - REASON FOR APPEAL**

This appeals Region's denial of my BP-10 (984472-R1, I.R. 3255949). All my filings are adopted
as if fully set forth here. (Received Response 8/8/19).
It seems I was denied because I am "now" claiming the money was for filing fees for a joint
lawsuit against the institution; but, "the evidence does not support your defense."
On the contrary, I was misled -- intentionally duped or not -- into this charge. I know the
rules and follow them. I never would have paid a third party to pay the court fee had I known
Kammeyer would then ask his sister to send my money to him.
I answer that I am not "now" claiming the court fee; Region erroneously thinks my position
changed. My affidavit in this matter was filed April 25, 2019 (Exhibit F in the Class Action
(not a "joint" filing).) The "shot" was written May 13, 2019. There is a timeline here. I've
never had a shot in my entire time and this over-reaction is blocking my Life Life Connections
Program Transfer (case manager Clark may confirm). And yes, I did consider this when I sent my
money to Mrs. Kranendonk. I was assured the proper means and ends were in order to go to the
lawsuit. I humbly ask that you dismiss this shot.

September 5, 2019                                    [signature]
DATE                                                SIGNATURE OF REQUESTER

**Part B - RESPONSE**

3308
10/2/19

**RECEIVED**

SEP 11 2019

Administrative Remedy Section
Federal Bureau of Prisons

---

DATE                                                GENERAL COUNSEL

ORIGINAL: RETURN TO INMATE                          CASE NUMBER: 984472-A1

**Part C - RECEIPT**
                                                    CASE NUMBER: _____

Return to: _____
            LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

SUBJECT: _____

DATE                          SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

UPN LVN                  [PRINTED ON RECYCLED PAPER]          **Exhibit B: BP-11 APPEAL**

```
ERIC DEXTER WELCH, 10444-089
MARION USP     UNT: UM EAST     QTR: B03-015L
P.O. BOX 2000
MARION,   IL 62959
```

RECEIVED
AUG 08 2019
BY:

**Exhibit C: BP-10 DENIAL**

**U.S. Department of Justice**
**Federal Bureau of Prisons**
**North Central Regional Office**

**Regional Administrative Remedy Appeal**
**Part B - Response**

**Administrative Remedy Number: 984472-R1**

This is in response to your Regional Administrative Remedy Appeal received on July 11, 2019, regarding the decision of the Discipline Hearing Officer (DHO). You were found to have committed the prohibited act of Code #328(A), Giving or Receiving Anything of Value (Attempted). You appeal this decision stating you sent money to a third party, whom was not an inmate, for legal fees. You state staff have made an inference, which is not evidence you committed the prohibited act. You request the incident report be expunged.

The DHO considered the reporting officer's documented report, your written statements presented, the testimony of your witnesses, supporting documentation, and your defense. It is documented you sent money to an inmate's sister. Email conversations from the inmate to his sister indicate you were helping him out by sending money. While you and the other inmate are now claiming the money was for filing fees for a joint lawsuit against the institution, the evidence does not support your defense. The DHO sufficiently explained why the greater weight of the evidence supports the charge. The discipline process was conducted in accordance with Program Statement 5270.09, Inmate Discipline Program.

Based on the above information, your Regional Administrative Remedy Appeal is denied.

If you are dissatisfied with this response, you may appeal to the Office of General Counsel, Federal Bureau of Prisons, 320 First Street, NW, Washington, DC 20534. Your appeal must be received in the Office of General Counsel within 30 days from the date of this response.

_07/23/19_
Date

_J. E. Krueger, Regional Director_

**Exhibit C: BP-10 DENIAL**

U.S. Department of Justice

Federal Bureau of Prisons

*Accepted as timely filed, prison mailbox rule, by BoP agents of Region by depositing in the legal mailroom, certified rec #*

**Regional Administrative Remedy Appeal**

7013 2630 0000 0956 7681

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: WELCH, ERIC D. / 10444-089 / B / USP Marion
LAST NAME, FIRST, MIDDLE INITIAL / REG. NO. / UNIT / INSTITUTION

**Part A - REASON FOR APPEAL**

It would seem that the act of sending a third party funds to pay a legal fee with the understanding (by me) that it would be contributed to the court provides a preponderance of evidence to find me guilty of 328.A (attempting to give money to another inmate without staff authorization) (DHO report, # IV).

On the contrary, a third party is not an inmate. The sworn statement by the other inmate implicates himself (Kemmeyers mistake).

I answer that in contrast to # IV's opening statement, I did provide "documentary evidence" at both UDC and DHO. (see attached). Further, an inference is not evidence. When person A and person B have a conversation, and then person A and person C have a similar but different conversation, the "evidence" of A-C is not evidence of what "B" knew or believed but rather is hearsay. Person B should be found innocent of any wrong doing, especially where person A admits his own mistake. My shot should be expunged and Mr Kemmeyers reduced to a 328 A.

July 6, 2019
DATE

SIGNATURE OF REQUESTER

**Part B - RESPONSE**

_____
DATE

REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE                    CASE NUMBER: _____

**Part C - RECEIPT**

                                               CASE NUMBER: _____

Return to: _____
           LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

SUBJECT: _____

_____     ⊛     _____
DATE                           SIGNATURE, RECIPIENT **Exhibit D: BP-10**

UPN LVN                                                              JUNE 2002

BP-A0304
JAN 17

## DISCIPLINE HEARING OFFICER REPORT

U.S. DEPARTMENT OF JUSTICE                        FEDERAL BUREAU PRISONS

| | |
|---|---|
| Institution:  USP Marion | Incident Report number:   3255949 |
| NAME OF INMATE:  WELCH, Eric | REG. NO.: 10444-089    UNIT: EAST |
| Date of Incident Report: 5-2-2019 | Offense Code:   217A |

Date of Incident: 5-2-2019

Summary of Charges:  Attempted Giving money to, or receiving money from, any person for the purpose of introducing contraband or any other illegal or prohibited purpose.

**I.     NOTICE OF CHARGE(S)**

A. Advanced written notice of charge (copy of Incident Report) was given to inmate on (date) __5-13-2019__ at (time) __7:20 P.M.__ (by staff member) __Lt. Huggins (Acting)__ .

B. The DHO Hearing was held on (date) __6-21-2019__ at (time) __9:08 A.M.__ .

C. The inmate was advised of the rights before the DHO by (staff member): __Counselor Thompson__ on (date) __5-15-2019__ and copy of the advisement of rights form is attached.

**II.    STAFF REPRESENTATIVE**

A. Inmate waived right to staff representative.  Yes _____  No __X__ .

B. Inmate requested staff representative and __UNICOR Miles__ appeared.

C. Staff Representative statement: Miles served as the Inmate's Staff Representative.  Both the Staff Representative and Inmate agreed that they had met and were ready to proceed with the hearing.  The Staff Representative has reviewed the paperwork and confirmed that this Inmate's due process rights have been afforded and stated, working with Welch, he is very legal savvy and I don't see him intentionally doing something like this.  I don't see him intentionally transferring money in a traceable manner.  He's been in UNICOR for 8 years.

D. Requested staff representative declined or could not appear but inmate was advised of option to postpone hearing to obtain another staff representative with the result that: (New Staff Representative Name)_____N/A_____ was selected.

E. Staff representative _____N/A_____ was appointed.

**III.   PRESENTATION OF EVIDENCE**

A. Inmate _____ (admits) __X__ (denies) _____ (neither) the charge(s).

B. Summary of inmate statement: We are plaintiffs in a case and gave her money to pay the courts.  There was a mix-up and she was going to give us our money back because it was paid twice.  Inmate submitted a Written Statement as well.

C. Witnesses:
1. Inmate waived right to witness. Yes_____  No __X__

2. The following persons were called as witness at this hearing and appeared (Each witness name and statement listed below): MILLER #42116-044; Back in April, following a bunch of instances where we were locked down for nine days, a lawsuit was filed.  Welch sent Kammeyer's sister the money for the filing fee along with Kammeyer's to keep things simple for the courts.  Thee was some miscommunication and the filing fee was already paid.  Mr Welch's filing fee was supposed to go to the courts, not back to Kammeyer.

ATTERBERRY #62284-097; Welch is in my Unit, we talked about the suit and he was going to send her the money and she file it with the court.  Kammeyer misunderstood from my understanding and Ms. Kramendonk was confused about who to send the money back to.  The intent was to make sure the filing fee was paid.  It was a mistake.

3. The following persons requested were not called for the reason(s) given (Each witness name and statement listed below): N/A

4. Unavailable witnesses were requested to submit written statements and those statements received were considered (Each witness name and statement listed below). N/A

1

**Exhibit E: DHO REPORT**

BP-A0304
JAN 17

**DISCIPLINE HEARING OFFICER REPORT**

**U.S. DEPARTMENT OF JUSTICE**                                    **FEDERAL BUREAU PRISONS**

| Name of Inmate: WELCH, Eric | Reg. No.: 10444-089 | Hearing Date: 6-21-2019 |
|---|---|---|

D. Documentary Evidence: In addition to the Incident Report and Investigation, the DHO considered the following documents:   **All Evidence Used by the DHO is Listed in Section V.**

E. Confidential information was used by DHO in support of his findings, but was not revealed to the inmate. The confidential information was documented in a separate report.  The confidential information has been (confidential informants have been) determined to be reliable because:                                   N/A                               .

IV.    FINDINGS OF THE DHO

_____ A. The act was committed as charged.          _____ C. No prohibited act was committed:
                                                     Expunge according to Inmate Discipline PS.
  X   B. The following act was committed:

328A: Attempted Giving money or anything of

value to, or accepting money or anything of

value from, another inmate or any other

person without staff authorization.

V.    SPECIFIC EVIDENCE RELIED ON TO SUPPORT FINDINGS (Physical evidence, observations, written documents, etc.):
The inmate's due process rights were reviewed by the DHO, during the hearing.  The inmate stated he understood his rights and did not submit any documentary evidence.  He confirmed he did request a witnesses and did request a staff representative during the DHO hearing all of which were present.

As stated in the Incident Report between May 12, 2019 and May 13, 2019, the SIS Office conducted a review of the financial transactions of inmates Kammeyer, James, reg. No. 20118-081 and Welch, Eric, Reg. No. 10444-089.  During the course of this review the following was discovered: On May 2, 2019, inmate Welch sent $110.00 to Ms. Jeannie Krankendonk of Bluffdale, Utah.  Ms. Krankendonk appears on the visiting list of inmate Kammeyer, and is listed as his siser.  On May 12, 2019, at approximately 7:10 p.m., and 7:20 p.m., respectively, inmates Welch and Kammeyer were interviewed in the LT's Office.  Welch submitted a written statement that Ms. Krankendonk was a member of the Orthodox Church who performs charity work for "St. Marks", and that he met her through a volunteer who visited USP Marion several years ago.  He stated that based on her charity work, he "decided to give a donation".  In this statement he also claimed to have only recently discovered Ms. Krankendonk was related to an inmate at USP Marion.  During the second interview, inmate Kammeyer stated that he had recently given the name and address of his sister to inmate Welch, so that inmate Welch could send him money to assist him in paying legal fees for an ongoing court case.  A subsequent review of inmate Kammeyer emails revealed that he both sent and received several emails from Ms. Krankendonk regarding the money transaction.  Of note were the following ; On April 29, 2019, Kammeyer sent the following, "My friends name is Eric.  I'm not sure how much he is going to send, but said he will sent it out soon, now that he has your address."  On May 9, 2019, Ms. Krankendonk sent the following, "I got a check from Eric today in the mail.  It says at the bottom, "Happy St. Mark's Day, Jimmy Jr…" not sure what that means, really.  I will have to go online and send the money to you tonight or if I can't get to it, I will do it when I get home on Sunday night.  Who is this friend, anyways?  I feel like I asked, but don't recall you tell me who he is.  Awesome of him to do this to help you, whoever he is."  And finally on May 13, 2019, Kammeyer sent "guess that having my friend send you money was against the rules…guess it is against the rules for inmates to help each other out financially, even if it is for legal stuff.

The DHO considered your statement during the Investigation stating, "See Attached".

The DHO considered you statement during the UDC, "I sent money Mrs. Krankendonk to  send directly to the court,  I had no idea she was going to send it to her brother".

The DHO considered your witness statements as documented in Section III. C. 2.

The DHO considered the statement from your staff representative as documented in Section II. C.

The DHO considered your statement as documented in Section III. B.

After careful consideration, the DHO found you committed the prohibited act of Code 328A: Giving or accepting money or anything of value in a correctional setting, not Code 217A.  Based on the greater weight of the evidence as presented above.  Specifically, section 11 of the incident report where staff shows emails from inmate Kammeyer to Ms. Krankendonk about money you sent.  Based upon

**Exhibit E: DHO REPORT**                                                              2

JP-A0304
JAN 17

**DISCIPLINE HEARING OFFICER REPORT**

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU PRISONS**

| Name of Inmate: WELCH, Eric | Reg. No.: 10444-089 | Hearing Date: 6-21-2019 |
|---|---|---|

the reporting officers documented report and your admission of sending her money during the hearing; all shows you committed the prohibited act.

**VI.   SANCTION OR ACTION TAKEN** (List each prohibited act with respective sanctions for that act):
CODE: 328A
30 DAYS LOSS OF COMMISSARY
30 DAYS LOSS OF VISITS

**VII.   REASON FOR EACH SANCTION OR ACTION TAKEN:**
328A
Giving or accepting money or anything of value in a correctional setting hampers staff's ability to maintain a safe and secure institution for other inmates and staff.  The sanctions imposed by the DHO were taken to express the seriousness of the infraction.  Although not directly related to the infraction, privileges were taken to deter the inmate from this behavior in the future.

**VIII. APPEAL RIGHTS:** __X__  The inmate has been advised of the findings, specific evidence relied on action and reasons for the action.  The inmate has been advised of the right to appeal this action within 20 calendar days under the Administrative Remedy Procedure.  A copy of this report has been given to the inmate.

**IX.   Discipline Hearing Officer**

| Printed Name | Signature | Date |
|---|---|---|
| S. Wallace | S Wallace | 6-24-19 |

DHO report delivered to Inmate by:

B. Mathis
Printed Name (Staff)

Signature:

6-26-19/ 801 Am
Date and Time:

Prescribed by P5270                    Replaces BP-A0304 of AUG 11

**Exhibit E: DHO REPORT**

BP-A0288
JAN 17
**U.S. DEPARTMENT OF JUSTICE**

# INCIDENT REPORT

**FEDERAL BUREAU OF PRISONS**

---

## Part I - Incident Report

| 1. Institution: USP Marion | | Incident Report Number: 3255949 | |
|---|---|---|---|
| 2. Inmate's Name<br>Welch, Eric | 3. Register Number<br>10444-089 | 4. Date of Incident<br>May 2, 2019 | 5. Time<br>10:00 am |
| 6. Place of Incident<br>B-Unit | 7. Assignment<br>CBL 3 | | 8. Unit<br>B-Unit-East-Byram |

| 9. Incident<br><br>Giving money to, or receiving money from, any person for the purpose of any other prohibited purpose. | 10. Prohibited Act Code(s)<br><br>217 A |
|---|---|

**11. Description of Incident (Date: 5/13/2019  Time: 11:15 am Staff became aware of incident)**

Between May 12, 2019 and May 13, 2019, the SIS Office conducted a review of the financial transactions of inmates Kammeyer, James, Reg. No. 20118-081, and Welch, Eric, Reg. No. 10444-089. During the course of this review the following was discovered; On May 2, 2019, inmate Welch sent $110.00 to Ms. Jeannie Krankendonk of Bluffdale, Utah. Ms. Krankendonk appears on the visiting list of inmate Kammeyer, and is listed as his sister. On May 12, 2019, at approximately 7:10 pm and 7:20 pm, respectively, inmates Welch and Kammeyer were interviewed in the LT's Office. Welch submitted a written statement that Ms. Krankendonk was a member of the Orthodox Church who performs charity work for "St. Marks", and that he met her through a volunteer who visited USP Marion several years ago. He stated that based on her charity work, he "decided to give a donation". In this statement he also claimed to have only recently discovered Ms. Krankendonk was related to an inmate at USP Marion. During the second interview, inmate Kammeyer stated that he had recently given the name and address of his sister to inmate Welch so Welch could send him money to assist him in paying legal fees for an ongoing court case. A subsequent review of inmate Kammeyer emails revealed that he both sent and received several emails from Ms. Krankendonk regarding the money transaction. Of note were the following; On April 29, 2019, Kammeyer sent the following, "*My friends name is Eric. I'm not sure how much he is going to send, but said he will send it out soon, now that he has your address.*" On May 9, 2019, Ms. Krankendonk sent the following, "*I got a check from Eric today in the mail. It says at the bottom, "Happy St. Mark's Day, Jimmy Jr..." not sure what that means, really. I will have to go online and send the money to you tonight or if I can't get to it, I will do it when I get home on Sunday night. Who is this friend, anyways? I feel like I asked, but don't recall you tell me who he is. Awesome of him to do this to help you, whoever he is.*" And finally on May 13, 2019, Kammeyer sent "*guess that having my friend send you money was against the rules... guess it is against the rules for inmates to help each other out financially, even if it is for legal stuff.*"

| 12. Typed Name/Signature of Reporting Employee:<br>M. McAlister, SIS Lieutenant. | 13. Date And Time:<br>5/13/2019 3:20 pm |
|---|---|

| 14. Incident Report Delivered to Above Inmate By<br>(Type Name/Signature):<br>D. Huckinst | 15 .Date Incident Report Delivered:<br>5-13-19 | 16. Time Incident Report Delivered:<br>1920 |
|---|---|---|

---

## Part II - Committee Action

**17. Comments of Inmate to Committee Regarding Above Incident:**

| 18. A. It is the finding of the committee that you:<br><br>_____ Committed the Prohibited Act as charged.<br>_____ Did not Commit a Prohibited Act.<br>_____ Committed Prohibited Act Code(s). _____ _____ | B. _____ The Committee is referring the Charge(s) to the DHO for further Hearing.<br>C. _____ The Committee advised the inmate of its finding and of the right to file an appeal within 20 calendar days. |
|---|---|

**19. Committee Decision is Based on Specific Evidence as Follows:**

**20. Committee action and/or recommendation if referred to DHO (Contingent upon DHO finding inmate committed prohibited act):**

**21. Date and Time of Action:_____ (The UDC Chairman's signature certifies who sat on the UDC and that the completed report accurately reflects the UDC proceedings).**

| Chairman (Typed Name/Signature) | Member (Typed Name) | Member (Typed Name) |
|---|---|---|

**Exhibit F: INCIDENT REPORT**

Joint Verified Statement
of James Kammeyer and Eric Welch

1.   This joint testimony responds to Incident Report 3255949 and 3255950
(Welch and Kammeyer, respectively).

2.   The two Incident Reports are identical. They allege we committed
Prohibited Act Code 217A (Attempted giving money to, or receiving money
from, any person for the purpose of any other prohibited purpose.)
The basis is "on May 2, 2019, inmate Welch sent $110.00 to Ms. Jeannie
Krankendonk of Bluffdale, Utah." She is the sister of inmate Kammeyer. It
continues that "Welch submitted written statement that Ms. Krankendonk was
a member of the Orthodox Church," performed charity work and he met her
through a volunteer who visited USP Marion several years ago and "gave a
donation". Welch claimed to only recently discover Ms. Krankendonk was
related to an inmate at USP Marion, and the report writer (Huggins) agrees
that Kammeyer recently gave her contact information to Welch "so that Welch
could send him money to assist him in paying legal fees for an ongoing
court case." The report finishes with a summary of emails between Kammeyer
and his sister, and concludes with "guess that having my friend send you
money was against the rules ... guess it is against the rules for inmates
to help each other out financially, even if it is for legal stuff." Ms.
Krankendonk was confused by this and has since complied with this new
information.

3.   Kammeyer states "I arrived at Marion about 2-½ years ago, right about
the time the volunteers that used to come in to Marion stopped coming in.
Mr. Welch simply overheard me talking to another person about my family and
thier characteristics, like any church gathering would. Any inaccuracy on
his part was simply memory loss or conflating things over time. This was at
the Orthodox service to which Mr. Welch referred."

**Exhibit G: MAY 15, JOINT
VERIFIED STATEMENT OF INMATES
KAMMEYER AND WELCH**

4.    Mr. Welch states "I submitted a written statement to Mr. Huggins on Sunday, May 12 at 7 p.m. or so and the following day I clarified I heard of her a couple (not several) years ago, and only recently obtained her contact information.  I submitted an updated, more thoughtful response of four pages on May 13, 2019." There was no intent to deceive Mr. Huggins.

5.    The Report is incorrect as to May 2, 2019 being the date.  The BP-199 was generated on Sunday, April 28 (see attached).  The Report also incorrectly records the information – shared with Huggins about "St. Marks".  The BP199 lacked the Case No. of the lawsuit because it had not been assigned one yet.  So, in order to keep track of what it was for, April 25 is the feast of St. Mark, the day the lawsuit was filed by Prison Mailbox Rule, while "Jimmy Jr." referred to the lead plaintiff (Welch is a plaintiff member of a class of all inmates at USP Marion.)  See, James Kammeyer, Jr., and All Inmates at U.S.P. Marion, vs. William True (Warden), D. Stickles (Captain), Daniel Huggins (S.I.S.), United States of America, S.D. Illinois, Case No. 3:19-cv-454, Judge Phil Gilbert.

6.    Any "church" reference involving "St. Marks" means the "gathering" of individuals placing their hopes in restorative justice on the feast day of the Patron Saint of Notaries (i.e. sworn signatures).  A quick review of the docket demonstrates 15 affidavits or so.  Despite his prior experience as the Religious Services Secretary, Mr. Huggins missed the reference, and grossly mischaracterized the facts, even after Welch explained it to him.

7.    WITNESSES:  During April and May of 2019, witnesses Thomas Attebury (64284-097) and Carlton Miller (42116-044), experienced first-hand knowledge of the following:

    a.  As inmates who submitted affidavits in the lawsuit, they (and Mr. Welch) are plaintiffs with every right to forward money to the S.D. of Illinois;

2

Exhibit G: MAY 15, JOINT VERIFIED STATEMENT OF INMATES KAMMEYER AND WELCH

b. That WELCH shared his thoughts and beliefs based on the knowledge available to him at the time that Mrs. Jeannie Kranendonk was going to mail the money WELCH sent her directly to the Court, and not Mr. Kammeyer;

c. WELCH was not aware until after he sent in the BP-199 that the lawsuit filing fee had already been paid in full, and Mr. Kammeyer mistakenly told his sister to send any money to him.

d. Based on their personal knowledge of Mr. Kammeyer, he had been suffering severe pain and disorientation due to a combined effect of a FLU as well as Chrohns disease. It is their sincere belief that when talking to his sister, he was simply "spaced out" and not thinking straight and uinintentionally or forgetfully told her to send the money to him.

e. That given the facts they personally can attest to, Mr. Kammeyer's Incident Report should be dismissed or reduced; and

f. That given the facts they personally attest to, Mr. Welch's Incident Report should be dismissed entirely.

8.  **THE NECESSARY ELEMENTS OF AN "ATTEMPT"**

An "attempt" is a type of "inchoate," or "incomplete" crime. It has **two** elements: <u>Intent</u>, and (to use the language of the Model Penal Code), a <u>Substantial Step</u>. M.P.C. § 5.01. And "intent" means "purposeful" or "knowing". The M.P.C. as well as federal law <u>reject</u> such lower intent as "reckless" and "negligent." Reckless or negligent mental states don't cut it.

The burden of proof at bar is by a "preponderance of the evidence." This means the "superiority in weight, importance, or influence", or that which has the most convincing force. Although not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other. (Black's Law Dictionary, Ninth Ed., 2009.)

An inference is not evidence. Here, Mr. Huggins agreed in person that he never asked Welch WHY he sent the money; only WHO he sent it to, WHAT and HOW much he sent (or THAT he did). There is also no note, letter, or phone call from Welch concerning his intent. As such, S.I.S. is left with Kammeyer's email and phone messages. These are evidence, to be sure, but

3

**Exhibit G: MAY 15, JOINT VERIFIED STATEMENT OF INMATES KAMMEYER AND WELCH**

only of Kammeyer's state of mind, not Welch's.  Either Huggins or McAlister
have to _infer_ intent for Welch.      But an inference is not evidence.  An
inference comes into play when asking what _level_ of state of mind of intent
existed?  "Purposeful," "Knowing," "Reckless," or "Negligent?"  The
Incident Report does not say. Lack of intent is insufficient to sustain an "attempt."

   In Kammeyer's case, there is evidence of intent.  But what level?
There is evidence of "reckless," or "negligent" for a couple of reasons.
(1) Witnesses have him as acting listless, disoriented, and in pain due to
the FLU and Chrohns disease during the time period in question;  (2)
Huggins may confirm Kammeyer could barely talk and could not read anything
when he picked up his shot on May 13; and Welch saw him in the hallway
afterward and noted his "frog voice;" and (3)  Welch's statements to
Huggins (in written form on May 13), clearly indicate his purposeful intent
was to have the money sent to the Court, not to Kammeyer.

   Certain witnesses with nothing to gain or lose are saying under oath
that Mr. Welch's version of the facts are correct.  The Incident Report and
its accomanying documents contain misleading information, admittedly based
in part on a lack of knowledge about the lawsuit and that any plaintiff is
always permitted to send money to the Court (not a prohibited act).

   The greater weight of the evidence supports a finding that Mr. Welch
did _not_ commit a prohibited act.  Further, the evidence suggests that
Kammeyer lacked the requisite level of intent under any standard of proof
to be guilty of an "attempt" due to his state of mind, and should be found
that he did _not_ commit a prohibited act, or at most committed a less severe
(i.e. 300 or 400 series) act.

May 15, 2019
Date Executed

May 15, 2019
Date. Executed

/s/ _Eric D. Welch_
Eric D. Welch (10444-089)

/s/ _James R. Kammeyer_
James R. Kammeyer (20118-081)

Under penalty of perjury pursuant to 28 U.S.C. § 1746, we hereby swear and verify that the foregoing
is true and correct as an affidavit to the best of our knowledge, information, and belief formed
after meaningful inquiry.

4   **Exhibit G: MAY 15, JOINT
   VERIFIED STATEMENT OF INMATES
   KAMMEYER AND WELCH**

## Verified Statement of THOMAS ATTEBURY (64284-097)

1. During the months of April and May 2019, immediately after the Warden-caused institutional lock-down, all inmates at USP-Marion filed a lawsuit under the Eighth Amendment's "cruel and unusual punishments" clause for staff-instigated violence and vigilantism that caused several inmates to suffer vicious assaults. See, James Kammeyer, Jr., and All Inmates at U.S.P. Marion, vs. William True (Warden), D. Stickles (Captain), Daniel Huggins (S.I.S), United States of America, S.D. Illinois, Case No. 3:19-cv-454, Judge Phil Gilbert.

2. I am aware of incident report 3255949 (WELCH, 10444-089), and 3255950 (KAMMEYER), concerning Prohibited Act Code 217A (attempt) "Giving money to, or receiving money from, any person for the purpose of any other prohibited purpose." They each shared this with me on 5/14/19.

3. I personally overheard evidence or understood in belief in April and May 2019 certain truth that exonerates WELCH:

   a) WELCH had every right to pay $110 to the court fee,

   x Jeanie   b) WELCH thought and believed based on all the knowledge available to him at the time that Mrs. Kranendonk was going to mail the money WELCH sent her directly to the Court, and not to inmate Kammeyer.

   c) Welch is a plaintiff and witness (as I am as well), with full legal rights permitting him to contribute to the lawsuit; and

   d) WELCH was not aware until after he sent it that the court fee had already been paid, and Kammeyer mistakenly told her to send any money to him.

4. Based on my own personal knowledge of KAMMEYER, he has been suffering severe pain and disorientation due to a combined effect of a FLU as well as Chrohns disease. It is my sincere belief that when talking to his sister, he was simply not thinking straight and unintentionally told her to send the money to him. He should have his incident report expunged or lower-severity.

_14 MAY 2019_   /s/ _____   64284-097
Date Executed          THOMAS ATTEBURY (64284-097)

Under penalty of perjury pursuant to
28 U.S.C. § 1746, I hereby swear and verify
that the foregoing is true and correct as an affidavit,
to the best of my knowledge, information, and belief
formed after meaningful inquiry.

Witnessed by:

_May 14, 2019_   /s/ _____
Date Executed          Eric D. Welch (10444-089)

_5-14-2019_   /s/ _____
Date Executed          James R. Kammeyer (20118-081)

**Exhibit H: MAY 14, VERIFIED STATEMENT OF INMATE THOMAS ATTEBURY**

Verified Statement of CARLTON MILLER (42116-044)

1. During the months of April and May 2019, immediately after the Warden-caused institutional lock-down, all inmates at USP-Marion filed a lawsuit under the Eighth Amendment's cruel and unusual punishments clause, for staff-instigated violence and vigilantism that caused several inmates to suffer vicious assaults. See, James Kammeyer, Jr., and All Inmates at U.S.P. Marion, vs. William True (Warden), D. Stickles (Captain), Daniel Huggins (S.I.S), United States of America, S.D. Illinois, Case No. 3:19-cv-454, Judge Phil Gilbert.

2. I am aware of incident report 3255949 (WELCH, 10444-089), and 3255950 (KAMMEYER), concerning Prohibited Act Code 217A (attempt) (Giving money to, or receiving money from, any person for the purpose of any other prohibited purpose.) They each shared this with me on 5/14/19.

3. I personally overheard evidence or understood in belief in April and May 2019 certain truth that exonerates WELCH:

   a) WELCH had every right to pay $110 to the court fee,

   b) WELCH thought and believed based on all the knowledge available to him at the time that Mrs. Jeannie Kranendonk was going to mail the money WELCH sent her directly to the Court, and not to inmate Kammeyer.

   c) Welch is a plaintiff and witness (as I am as well), with full legal rights permitting him to contribute to the lawsuit; and

   d) WELCH was not aware until after he sent it that the court fee had already been paid, and Kammeyer mistakenly told her to send any money to him.

4. Based on my own personal knowledge of KAMMEYER, he has been suffering severe pain and disorientation due to a combined effect of a FLU as well as Chrohns disease. It is my sincere belief that when talking to his sister, he was simply not thinking straight and unintentionally told her to send the money to him. He should have his incident report expunged or lower-severity.

_5/15/2019_ /s/ _Eric 7_
Date Executed                         CARLTON MILLER (42116-044)

Under penalty of perjury pursuant to
28 U.S.C. § 1746, I hereby swear and verify
that the foregoing is true and correct as an affidavit,
to the best of my knowledge, information, and belief
formed after meaningful inquiry.

Witnessed by:

_May 15, 2019_ /s/ _Eric W_
Date Executed                         Eric D. Welch (10444-089)

_May 15, 2019_ /s/ _____
Date Executed                         James R. Kammeyer (20118-081)

**Exhibit I: MAY 15, VERIFIED STATEMENT OF INMATE CARLTON MILLER**

TRULINCS  10444089 - WELCH, ERIC DEXTER - Unit: MAR-B-A

--------------------------------------------------------------------------------------------------------

FROM: 10444089
TO: Recreation
SUBJECT: ***Request to Staff*** WELCH, ERIC, Reg# 10444089, MAR-B-A
DATE: 05/19/2019 01:11:54 PM

To: Mr. Wallace
Inmate Work Assignment: UNICOR

Mr. Wallace,

I am writing with the intent of following up with the rest of this, as it does not have the ability save. I understand you are still doing DHO up front due to letting your foot heal up. I hope that is going well.

*******************************************

My question:
Does poor communication create a money-laundering conspiracy?

It would seem that according to SIS it does. I had a UDC "hearing" with Mr. J. David and Mr. Thompson on Wednesday May 15. In so many words, they both instructed me that DHO is a rubber-stamp kangaroo court. It could be that they were just being assholes, or it could be a combination of both. Bantering on, they indicated it does not matter what evidence and context and witnesses say, it will be affirmed. I said "alright, but here is my statement." They would not take my statement, which is a "Joint Verified Statement of James Kammeyer and Eric Welch". It was only four pages and I'll drop it in the institution's intraoffice mailbox. I asked him to just write "see attached" on the shot, but he didn't. He paraphrased something.

Anyway, and on the contrary, poor communication did not create a money-laundering conspiracy worthy of a 217A Prohibited Act.

1. This joint testimony responds to Incident Report 32355949 and 3255950 (Welch and Kammeyer, respectively).

2. The tow Incident Reports are identical. They allege we committed Prohibited Act Code 217A (Attempted, giving money to, or receiving money from, and person for the purpose of any other prohibited purpose.) [side note, "purpose" is the same as "intent" and "attempt" is made of an "intent" and a "substantial step" (see below).]
     The basis is "on May 2, 2019, inmate Welch sent $110.00 to Ms. Jeannie Krankendonk [sic] of Bluffdale, Utah." She is the sister of inmate Kammeyer. It continues that "Welch submitted written statement that Ms. Krnakendonk [sic] was a member of the Orthodox Church," performed charity work and he met her through a volunteer who visited USP Marion several years ago and "gave a donation." Welch claimed to only recently discover Ms. Krankendocnk [sic] was related to an inmate at USP Marion, and the report writer (Huggins/McCalister) agrees that Kammeyer recently gave her contact information to Welch "so that Welch could send him money to assist him in paying legal fees for an ongoing court case." The report finishes with a summary of emails between Kammeyer and his sister, and concludes with "guess that having my friend send you money was against the rules ... guess it is against the rules for inmates to help each other out financially, even if it is for legal stuff." Ms. Kranendonk was confused by this and has since complied with this new information.

3. Kammeyer states: "I arrived at Marion about 2-1/2 years ago, right about the time the volunteers that used to come in to Marion stopped coming in. Mr. Welch simply overheard me talking to another person about my family and their characteristics, like any church gathering would. Any inaccuracy on his part was imply memory loss or conflating things over time. This was at the Orthodox service to which Mr. Welch referred."

4. Mr. Welch states: "I submitted a written statement to Mr. Huggins on Sunday, May 12 at 7 p.m. or so [completely surprised that I had to do so. I was just finishing watching 60 Minutes], and the following day I clarified I heard OF her a COUPLE (not several) years ago, and only recently obtained her contact information. I submitted an updated, more thoughtful response of four pages on May 13, 2019." There was no intent to deceive Mr. Huggins.

5. The Incident Report is incorrect as to May 2, 2019 being the date. The BP-199 was generated on Sunday, April 28. The Report also incorrectly records the information -- shared with Huggins about "St. Marks>" The BP-199 lacked the Case Number of the lawsuit because it had not been assigned on yet. So, in order to keep track of what it was for, April 25 is the feast o St.. Mar, the day the lawsuit was filed by Prison Mailbox Rule, while "Jimmy R." referred to the lead plaintiff (Welch is a plaintiff member of a class of all inmates at USP Marion.) See, James Kammeyer, Jr., and All Inmates at U.S.P. Marion, vs. William True (Warden), D. Stickles (Ca[ptain), Daniel Huggins (S.I.S.), United States of America, S.D. Illinois, Case No. 3:19-cv-454,

**Exhibit J: MAY 19, EMAIL FROM
WELCH TO DHO OFFICER WALLACE**

TRULINCS 10444089 - WELCH, ERIC DEXTER - Unit: MAR-B-A
--------------------------------------------------------------------------------

Judge Phil Gilbert.

6. Any "church" reference involving "St. Mars" means the "gathering" of individuals placing their hopes in restorative justice on the feast day of the Patron Saint of Notaries (i.e. sworn signatures). A quick review of the docket demonstrates 15 affidavits or so. Despite his prior experience as the Religious Services Secretary, Mr. Huggins missed the reference, and mischaracterized the facts, even after Welch explained it to him verbally on Sunday, May 12.

7. WITNESSES: During April and May of 2019, witnesses Thomas Attebury (64284-097) and Carlton Miller (42116-044), experienced first-hand knowledge of the following:

   a. As inmates who submitted affidavits in the lawsuit, they (and Mr. Welch) are plaintiffs with every right to forward money to the S.D. of Illinois;

   b. That WELCH shared his thoughts and beliefs based on the knowledge available to him at the time that Mrs. Jeannie Kranendonk was going to mail the money WELCH sent her directly to the Court, and not Mr. Kammeyer;

   c. WELCH was not aware until after he sent in the BP-199 that the lawsuit filing fee had already been paid in full, and Mr. Kammeyer mistakenly told his sister to send any money to him.

   d. Based on their personal knowledge of Mr. Kammeyer, he had been suffering severe pain and disorientation due to a combined effect of a FLU as well as Chrohns disease [and had suffered a panic attack while at Psychology Services]. It is their sincere belief that when talking to his sister, he was simply "spaced out" and not thinking straight and unintentionally or forgetfully told her to send the money to him.

   e. That given the facts they personally can attest to, Mr. kammeyer's Incident Report should be dismissed or reduced; and

   f. That given the fact they personally attest to, Mr. Welch's Incident Report should be dismissed entirely.

[Side Note: Mr. Kammeyer has been seeing Dr. Novatne about these issues and has recently made contact with Dr. Meinke as well. He is expected to request corroborating evidence about his mental state at the time of the events sometime after this week].

8. The Necessary Elements of an "Attempt"

   An "attempt" is a type of "inchoate," or "incomplete" crime. It has TWO elements: Intent, and a Substantial Step (to use the language of the Model Penal Code, Section 5). And "Intent" means "purposeful" or "knowing" In fact, the Incident report uses the word "purpose" twice in the prohibited act section.

   The MPS as well as federal law reject such lower intent as "reckless" or "negligent". Reckless or negligent mental states don't cut the mustard. This is likely why the Policy allows for a Psychological determination to mitigate or eliminate an inmates culpability.

   (to be continued).....

**Exhibit J: MAY 19, EMAIL FROM WELCH TO DHO OFFICER WALLACE**

TRULINCS 10444089 - WELCH, ERIC DEXTER - Unit: MAR-B-A

--------------------------------------------------------------------------------------------------------

FROM: 10444089
TO: Recreation
SUBJECT: ***Request to Staff*** WELCH, ERIC, Reg# 10444089, MAR-B-A
DATE: 05/20/2019 06:45:26 AM

To: Mr. Wallace
Inmate Work Assignment: UNICOR

continued from yesterday's email:

An inference is not evidence. Here, Mr. Huggins agreed in person that he never asked Welch WHY he sent eh money; only WHO he sent it to, WHAT and HOW much he sent (or THAT he did). There is also no note, letter, or phone call from Welch concerning his intent (i.e. "purpose" to use the Incident Report's language). As such, S.I.S. is left with Kammeyer's email and phone messages. These are evidence, to be sure, but only of Kammeyer's state of mind, not Welch's. Either Huggins or McAlister have to infer intent from Welch and assume Kammeyer's state of mind about Welch first.

But an inference is not evidence. An inference comes into play when asking what level of state of mind of intent (purpose) existed? "Purposeful," (the language of the shot), "Knowing," "reckless,' or "negligent?" The incident report does not say (or only infers "purpose"). Lack of intent is insufficient to sustain an "attempt."

In Kammeyer's case, there is evidence of intent. But what level? There is evidence of "reckless," or "negligent" for a couple of reasons.

(1) Witnesses with no skin in the game (nothing to gain or lose) have him as acting listless, disoriented, and in pain due to the FLU and Crohns disease (and his doctors may attest to contemporaneous panic attacks), during the time period in question; (2) Huggins may confirm Kammeyer could barely talk and could not read anything when he picked up his shot on May 13; and Welch saw him in the hallway afterward and noted his "frog voice;" and (3) Welch's statements to Huggins (in written form on May 13 and following), clearly indicate his purposeful intent was to have the money sent to the Court, not to Kammeyer (due Welch's status as class plaintiff).

Certain witnesses are saying under oath (and without being coerced or coaxed), that Mr. Welch's version of the facts are correct. Although mostly correct on the facts it does contain, the Incident Report and its accompanying documents contain misleading information, admittedly based on a lack of knowledge about the lawsuit and that any plaintiff is always permitted to send money to the Court (i.e. not a "prohibited purpose" or "act").

The greater weight of the evidence supports a finding that Mr. Welch did not commit a prohibited act. Further, the evidence suggests that Kammeyer lacked the requisite level of intent under any standard of proof to be guilty of an "attempt" due to his state of mind, and should be found that he did not commit a prohibited act (or at MOST a 328A, not a 217A).

Thank you for your time and patience.

Poor communication on our part did not create a money-laundering conspiracy. We were simply two plaintiff's out of 1,000 that were trying to get our money to the court due to the serious nature of the issues contained there.

Respectfully,

Eric Welch

**Exhibit J: MAY 19, EMAIL FROM WELCH TO DHO OFFICER WALLACE**